# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DEBORAH L. DICKMAN**
            **Plaintiff,**

            **v.**                                          **Case No. 08-C-898**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
            **Defendant.**

---

## DECISION AND ORDER

Plaintiff Deborah Dickman applied for disability insurance benefits ("DIB") and supplemental security income ("SSI"), claiming inability to work due to pain in her right wrist and forearm. (Tr. at 49-53; 56; 194). The Social Security Administration ("SSA") denied the claim initially and on reconsideration (Tr. at 29-40; 192; 193; 198), as did an Administrative Law Judge ("ALJ") after a hearing (Tr. at 9-20). When the SSA's Appeals Council denied plaintiff's request for review (Tr. at 4), the ALJ's decision became the SSA's final determination. See Nelms v. Astrue, 553 F.3d 1093, 1097 (7th Cir. 2009). Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## I.  APPLICABLE LEGAL STANDARDS

### A.    Judicial Review

Judicial review under § 405(g) is limited to determining whether the ALJ's decision is supported by "substantial evidence" and free of harmful legal error. Nelms, 553 F.3d at 1097 (citing 42 U.S.C. § 405(g); Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007); Rice v. Barnhart, 384 F.3d 363, 368-69 (7th Cir. 2004)). Evidence is "substantial" if it is sufficient for

a reasonable person to accept as adequate to support the decision. Ketelboeter v. Astrue, 550 F.3d 620, 624 (7th Cir. 2008) (citing Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003)); see also Berger v. Astrue, 516 F.3d 539, 544 (7th Cir. 2008) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Thus, if conflicting evidence in the record would allow reasonable people to differ as to whether the claimant is disabled, the ALJ's decision to deny the application must be upheld. See, e.g., Lee v. Sullivan, 988 F.2d 789, 793-94 (7th Cir. 1993). The reviewing court may not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. Rice, 384 F.3d at 369. If the ALJ makes an error of law, the court may reverse without regard to the volume of evidence in support of the factual findings, White v. Apfel, 167 F.3d 369, 373 (7th Cir. 1999), but only if the error is harmful, see Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003) (holding that "the doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions").

## B.    Disability Standard

In determining disability, the ALJ proceeds through a sequential five-step process, asking:

> (1)    Is the claimant is working?
>
> (2)    If not, does the claimant have a severe mental or physical impairment, i.e. one that significantly limits her ability to do basic work activities?
>
> (3)    If so, does that impairment meet or equal any of the presumptively disabling conditions found in the "Listings"?[1]
>
> (4)    If not, does the claimant possess the residual functional capacity ("RFC") to perform her past work?

---

[1]If so, the claimant is deemed disabled without further consideration of her ability to work.

2

(5)     If not, is the claimant capable of performing other work that exists in the national economy?

See Skinner, 478 F.3d at 844 n.1; Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

The claimant carries the burden at steps one through four, but if she reaches step five the burden shifts to the SSA.  See Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001).  In order to meet this burden, the ALJ may either rely on the "Grid," a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education and work experience, or summon a vocational expert ("VE") to provide testimony on the claimant's ability to transition to other work.  However, because the Grid considers only "exertional" (i.e., strength) limitations, if the claimant suffers from "non-exertional" limitations that substantially reduce her range of work the ALJ may not use the Grid and must consult a VE (although he may use the Grid as a "framework" for making a decision).  See, e.g., Fast v. Barnhart, 397 F.3d 468, 470-72 (7th Cir. 2005); Masch v. Barnhart, 406 F. Supp. 2d 1038, 1041-42 (E.D. Wis. 2005).

## II.  FACTS AND BACKGROUND

### A.     Medical Evidence

#### 1.     Treating Sources

In June 1997, plaintiff underwent a de Quervain's tenosynovitis release performed by Dr. Bradley Fideler.[2]  She recovered well and returned to work within a few weeks without significant problems.  (Tr. at 121-25; see also Tr. at 136-40.)

On March 13, 2002, plaintiff saw Dr. Michael Fehling, complaining of a cold.  The doctor

---

[2]de Quervain tenosynovitis is inflammation of the tendons of the first dorsal compartment of the wrist.  Stedman's Medical Dictionary 1795 (27th ed. 2000.)

3

assessed bronchitis/sinusitis and recommended that she quit smoking and drink plenty of fluids. (Tr. at 160.) On July 18, 2002, plaintiff complained of trouble sleeping, and Dr. Fehling prescribed Zoloft. (Tr. at 158-59.) Plaintiff returned to Dr. Fehling on June 1, 2004 for an exam under the Wisconsin Well Woman Program, and Dr. Fehling assessed hyperlipidemia and chronic obstructive pulmonary disease ("COPD"), again encouraging plaintiff to quit smoking. (Tr. at 153-54.)

On August 9, 2004, plaintiff returned to Dr. Fideler, complaining of ongoing problems with her right wrist. Dr. Fideler thought her symptoms suggestive of carpal tunnel syndrome and ordered an EMG (Tr. at 119), which revealed mild median neuropathy in the right wrist (Tr. at 116-18). Plaintiff saw Dr. Fideler again on September 13, 2004, continuing to have a great deal of difficulty with her right wrist, including numbness, tingling and dropping things. (Tr. at 115.) Dr. Fideler discussed performing a release of the right carpal tunnel (Tr. at 115), but the surgery apparently never occurred.

On June 30, 2005, plaintiff saw Dr. Kurt Brueckert complaining of upper respiratory symptoms. He noted a history of COPD and diagnosed acute bronchitis, more like an exacerbation of COPD, albeit mild. He advised her to use an inhaler and provided sample medication. (Tr. at 147.)

On July 15, 2005, plaintiff saw Dr. James Knavel, complaining of severe right upper extremity pain, numbness and tingling in the fingers, and inability to grip or lift with the right hand. (Tr. at 131; 184.) Dr. Knavel suspected "complex regional pain syndrome," noting that while plaintiff's hand and wrist were not shiny or atrophic the persistence and widespread nature of her pain were consistent with that condition. He doubted that carpal tunnel release would do much to improve her complaints and suggested that she see a hand surgeon. Dr.

4

Knavel obtained x-rays of the wrist, which seemed completely normal. (Tr. at 132; 185.) Plaintiff apparently never saw a hand surgeon due to lack of funds. (Tr. at 173.) Plaintiff returned to Dr. Fehling on August 30, 2005, and he diagnosed a "bruit" in her left carotid artery,[3] a ventral hernia in her upper abdominal wall, and hyperlipidemia. (Tr. at 142; 145-46; 186.)

In an RFC questionnaire dated April 20, 2006, Dr. Fideler listed plaintiff's diagnosis as right carpal tunnel syndrome; her symptoms as numbness in the fingers, difficulty gripping and grasping, and daily wrist pain; and her prognosis as "good." (Tr. at 179.) He indicated that no psychological conditions affected her physical condition, that she seldom experienced pain or other symptoms severe enough to interfere with attention and concentration, and that she had no limitation in her ability to deal with work stress. (Tr. at 180-81.) He imposed no limits on her ability to walk, sit or stand (Tr. at 181), and indicated that she could lift up to twenty pounds occasionally and ten pounds frequently (Tr. at 182). Finally, he opined that she had significant limitation in her ability to use her right arm, limiting her to 35% of an 8 hour day using her hand for grasping, turning and twisting; using her fingers for fine manipulation; and using her arm for reaching overhead. (Tr. at 182.)

On April 9, 2008, occupational therapist Kim Cuculi completed a functional capacity evaluation, noting diminished grip and pinch strength, particularly in the right hand. (Tr. at 188-89.) Plaintiff's maximum lifting/carrying weight was six pounds, her maximum push was twenty pounds, and her maximum pull was seventeen pounds. Based on testing, Cuculi opined that

---

[3]A "bruit" is a systolic murmur heard in the neck. Stedman's Medical Dictionary 253 (27th ed. 2000).

plaintiff was capable of sedentary work (infrequent lifting of ten pounds or less).  (Tr. at 191.)[4]

### 2.    SSA Consultants

On November 15, 2005, an SSA consultant completed a physical RFC report, finding plaintiff capable of light work (i.e., lifting up to twenty pounds occasionally, ten pounds frequently; standing/walking and sitting about six hours in an eight hour day; unlimited pushing/pulling) with no additional limitations.  (Tr. at 161-68.)  A second consultant reviewed and approved the report on March 7, 2006.  (Tr. at 168.)

## B.    Hearing Testimony

### 1.    Plaintiff

Plaintiff testified that she was fifty-three years old, right-handed, 5'2" tall and 175 pounds, with an eleventh grade education.  (Tr. at 237; 238; 241.)  She stated that she lived in a one level ranch home with her ex-husband, who was disabled.  (Tr. at 237-38.)  Plaintiff testified that she last worked in 2005, quitting that job after four days due to pain and swelling in her right wrist.  (Tr. at 238; 244.)  Prior to that, she worked on an assembly line for seven years and as a bank teller for three years.  (Tr. at 238-39.)

Plaintiff related her inability to work primarily to problems with her right arm – constant pain, burning in the wrist, numbness of the fingers, soreness in the thumb, and pain shooting up to her shoulder with activity.  (Tr. at 240-41.)  She testified that she could not lift a gallon of milk with her right hand; nor did she use a computer, type or knit.  (Tr. at 241-42.)  Plaintiff stated that she also experienced problems with her left shoulder, including burning and

---

[4]Plaintiff also submitted letters in support of her claim to the Appeals Council.  (Tr. at 202-20.)  Although technically part of the administrative record, I may not rely on this evidence to reverse the ALJ's decision.  See Rice, 384 F.3d at 366 n.2.

6

swelling; that her back bothered her; and that her legs became numb with lengthy sitting. She testified that she could walk for about an hour. (Tr. at 242.)

Plaintiff stated that on a typical day she woke up, let the dog out and did some housework with help from her ex-husband. (Tr. at 243.) She stated that she did laundry with help, cooked about once per day, did some cleaning, but no longer did yard work or snow shoveling. (Tr. at 243.) The only medication she currently took was over-the-counter Tylenol; she had no health insurance or ability to pay for healthcare (Tr. at 240) and could not see the hand surgeon recommended by Dr. Knavel due to her lack of insurance and inability to pay (Tr. at 244).

**2.      VE**

The VE, Paul Maulucci, classified plaintiff's past employment as an assembler as light, semi-skilled work, and as a bank teller as light, skilled work. (Tr. at 244-46.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education and work history, limited to light work with no more than occasional reaching, gross or fine manipulation with the right (dominant) hand. The VE opined that such a person could not perform plaintiff's past work but could perform other jobs in the State of Wisconsin such as video monitor (2400 jobs), officer helper (4000) and gate tender (4000). (Tr. at 246-47.) Plaintiff's counsel modified the hypothetical to include a lifting restriction of infrequent lifting of ten pounds or less, as indicated in Cuculi's report, but the VE testified that the identified positions, which did not require lifting beyond that level, could still be done. (Tr. at 247.) The VE stated that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. at 247.)

7

**C.    ALJ's Decision**

On May 28, 2008, the ALJ issued an unfavorable decision.  Following the five-step process, the ALJ determined that plaintiff had not engaged in substantial gainful activity since her alleged disability onset date and that she suffered from severe impairments – mild median neuropathy in the right wrist, ventral hernia and status post de Quervain tenosynovitis release surgery – none of which met or equaled a Listing.[5]  (Tr. at 14-16.)  Affording controlling weight to Dr. Fideler's April 20, 2006 report, the ALJ concluded that plaintiff retained the RFC for light work with no more than occasional reaching, gross manipulation or fine manipulation.  (Tr. at 16-17.)  Based on this RFC and relying on the VE's testimony, the ALJ concluded that plaintiff could not return to her past work but could perform other jobs that exist in significant numbers in the national economy.[6]  (Tr. at 18.)  He therefore found plaintiff not disabled and denied the application.  (Tr. at 19-20.)

### III.  DISCUSSION

Plaintiff argues that the ALJ erred in his step-five evaluation, and that the case should be remanded for an award of benefits.  In the alternative, she argues that the matter should be

---

[5]The ALJ acknowledged that plaintiff listed symptoms of depression and anxiety in a disability report (Tr. at 104-05), but he found no evidence of a severe mental disorder.  The ALJ noted that plaintiff received Zoloft in 2002, but the accompanying treatment notes indicated that the prescription related to insomnia and situational stressors.  Finally, Dr. Fideler noted no psychological condition in his report.  (Tr. at 15.)

[6]The ALJ noted that using Grid Rules 202.18 and 202.11 as a framework supported a finding of not disabled.  (Tr. at 18-19.)  These Rules apply to an individual with a limited education, no transferrable skills and a light RFC.  Rule 202.11 applies to a person aged fifty to fifty-four, while Rule 202.18 applies to a person under age fifty.  See  20 C.F.R. Part 404, Subpart P, App. 2, §§ 202.11 & 202.18.  Because transferability of  skills was not material to the determination – the Rules supported a finding of not disabled either way – the ALJ made no formal finding on that issue.  (Tr. at 18.)  As indicated above, the VE classified plaintiff's past work as semi-skilled and skilled.  (Tr. at 246.)

8

remanded for proper consideration of her complex regional pain syndrome, her mental impairment and her credibility. I address each argument in turn.

## A. Step Five Errors

### 1. Sedentary v. Light RFC

Plaintiff first argues that the ALJ's decision should be reversed and the case remanded for an award of benefits under the Grid. She contends that while the ALJ adopted an RFC for light work, the VE's response to her counsel's hypothetical question revealed that the jobs the ALJ relied upon at step five were actually sedentary. She claims that the VE's testimony thus showed that the light occupational base was completely eroded and only sedentary jobs existed that met the ALJ's hypothetical. Under Grid Rule 201.10, a person aged fifty to fifty-four with a limited education and no transferrable skills, limited to sedentary work, is considered disabled. Plaintiff turned fifty on October 4, 2004, and she asks that the case be remanded and paid as of that date.

I fail to see how the VE's response requires me to reject the ALJ's light RFC determination, find that plaintiff is limited to sedentary work, and mandate payment under the Grid.[7] The ALJ's RFC finding is supported by substantial evidence, including the reports of plaintiff's treating physician and the SSA consultants. No report from an acceptable medical source says otherwise, and plaintiff makes no serious attempt to show otherwise.

In any event, plaintiff seems to misapprehend the VE's testimony and the applicable regulations. The relevant exchange between plaintiff's counsel and the VE was as follows:

_____

[7]Rule 201.10 applies only if the claimant has no transferable skills. As noted above, the ALJ made no finding on this issue. If a claimant with these other characteristics has transferable skills, Rule 201.11 directs a finding of not disabled.

9

> Q    Modifying the hypothetical in terms of the exertional limitations, if the same hypothetical were given with the physical demand characteristics of work modified to be infrequent lifting of ten pounds or less, and I'm referring to Exhibit 8F [the Cuculi report], would that change your opinion concerning occupations available with such a hypothetical?
>
> A    No, the, if you want, video monitor is basically sedentary with no lifting requirement.  Office helper, you wouldn't be lifting more than ten pounds, and gate tender there is really no lifting.

(Tr. at 247.)  Although the VE described one of the jobs as "basically sedentary" and indicated that the other two did not require lifting more than ten pounds, that does not necessarily mean that these are "sedentary" rather than "light" jobs under the Commissioner's regulations.  The difference between the two categories consists of more than the lifting requirements.

> Under 20 C.F.R. § 404.1567(b):
>
> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Sedentary work, on the other hand:

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).  As explained in SSR 83-10, "the primary difference" between sedentary work and light work is that light work involves a good deal of walking and standing, while sedentary work requires only occasional walking and standing.  Even if the job requires

10

little lifting, it stills fall in the light category if it "requires a good deal of walking or standing." SSR 83-10.

As noted, in this case the ALJ found plaintiff capable of light work, and plaintiff does not seriously contest that determination. She points to no substantial evidence of restriction on her ability to stand or walk. Indeed, the therapist's report upon which she relies in making this argument does not contain any such limitations.[8] (See Tr. at 189-90.) Nor did her counsel ask the VE about any limitations on standing and walking. Rather, counsel's question proposed and the response discussed only lifting restrictions. As indicated above, under § 404.1567(b) and SSR 83-10, a job requiring little or no lifting is still considered light if the employee spends most of the day on her feet. Standing and walking are not, as plaintiff contends in her reply brief, nonexertional functions. See Fast, 397 F.3d at 470 (contrasting exertional and nonexertional impairments).

Further, the ALJ understood and fulfilled his obligation to consult the Grid as a "framework" for making a decision, specifically noting that a finding of "not disabled" would be directed by Rules 202.18 and 202.11. (Tr. at 19.) Because plaintiff suffered from significant nonexertional limitations, as well, the ALJ could not base his final determination on the Grid and thus consulted a VE.

Plaintiff also argues that both sedentary and light work require good use of the hands, and that a limitation to less than occasional use of the hands, as the ALJ imposed here, would force the claimant down from the light to the sedentary level. But it is sedentary work, not light

---

[8]The report finds plaintiff capable of "sedentary" work, but this is based on plaintiff's tolerance for "infrequent lifting of 10 lbs. or less." (Tr. at 191.) Cuculi used the word "sedentary" but not in the precise sense it is used in the Commissioner's Rulings and regulations.

11

work, that generally requires "the use of one's hands and fingers to perform repetitive actions,"

Keith v. Barnhart, 473 F.3d 782, 784 n.4 (7th Cir. 2007) (citing SSR 83-10), and a limitation on

use of the hands does not reduce a claimant's exertional level. As the Sixth Circuit explained

in rejecting a similar argument:

> [Plaintiff] misapprehends the analysis that is applicable to her situation. Essentially, [plaintiff] wants to use the fact that she is not capable of doing all of the jobs in the light work category due to her nonexertional limitation (her left hand impairment) to drop her category level down to sedentary. As a result, she argues that the ALJ should have used Rule 201.09, pertaining to sedentary work, rather than Rule 202.10, pertaining to light work. But that is not how the process works. There is no support for her argument that her nonexertional limitation allows her to decrease the level of her exertional capacity from light to sedentary. The magistrate judge accurately analyzed this point in his Report and Recommendation:

>> Here, the evidence shows (and the ALJ found) that plaintiff's occupational base is reduced by her nonexertional limitation, but her exertional capacity for light work is undiminished and undisputed. Though the policy statement of Social Security Ruling 83-12 does not apply to this situation as such, the Ruling does address the loss of use of an upper extremity as one of two "special situations."

> The magistrate judge then goes on to quote Ruling 83-12 on this matter at length. Acknowledging that people with such an impairment might be unable to perform all of the jobs in the light-work category, the Ruling notes that "[t]hese individuals would generally not be expected to perform sedentary work because most unskilled sedentary jobs require good use of both hands." S.S.R. 83-12, 1983 WL 31253, *4 (S.S.A.). This point refutes [plaintiff's] argument that the ALJ should have analyzed her impairments as though her exertional capacity were sedentary.

> Ruling 83-12 goes on to describe the appropriate procedure to follow in such a situation. "Given an individual's particular [residual functional capacity], a [vocational expert] will be able to determine the size of the remaining occupational base, cite specific jobs within the individual's [residual functional capacity], and provide a statement of the incidence of those jobs in the region of the individual's residence or in several regions of the country." Id. This is precisely what took place in [plaintiff's] case. See Kirk, 667 F.2d at 528-29 ("Thus, if the nonexertional limitation restricts a claimant's performance of a full range of work at the appropriate residual functional capacity level, nonexertional

12

limitations must be taken into account and a non-guideline determination made."). [Plaintiff], on the other hand, wants to use her nonexertional limitation to place her in a category on the grid that will mandate a finding of disability. We find no justification for [plaintiff's] position.

Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003).

In sum, the ALJ found plaintiff capable of light work, a finding supported by substantial evidence. Plaintiff fails to demonstrate that her claim must be evaluated under the sedentary Rules. Therefore, for all of these reasons, I will not remand the matter for an award under the Grid.

## 2. Proximity of Identified Jobs

Plaintiff next argues that the VE failed to identify jobs "in reasonable proximity to her home." See Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004) (stating that "the test is whether she is so disabled that there are no jobs in reasonable proximity to where she lives that she is physically able to do"). However, the Seventh Circuit later clarified this statement on rehearing in Barrett:

> The government, distressed by one sentence in our opinion in Barrett v. Barnhart, 355 F.3d 1065 (7th Cir. 2004), asks us to change it (the government does not ask us to reconsider our decision, which was adverse to it). The sentence is: "The test [of the plaintiff's entitlement to disability benefits] is whether she is so disabled that there are no jobs in reasonable proximity to where she lives that she is physically able to do." 355 F.3d at 1067 (emphasis added). It is the phrase that we have italicized that bothers the government, which points out that the law does not require, to defeat a finding of disability, that jobs exist in the immediate area in which the claimant lives. 42 U.S.C. § 423(d)(2)(A) provides that a person is disabled if he cannot do his previous work or "engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." That is the language the government would like us to substitute.

13

Yet in our experience, and, it seems, in that of the other circuits as well, the vocational experts who testify in social security disability cases concerning the availability of jobs that the applicant has the physical ability to perform almost always confine their testimony to indicating the number of such jobs that exist in the applicant's state, or an even smaller area. We have found only a few cases in which national numbers alone were cited as a basis for denying benefits. In practice, the principal significance of the "other regions" language in the statute is to prevent the Social Security Administration from denying benefits on the basis of "isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the applicant] live[s]," 20 C.F.R. § 404.1566(b).

Our formulation that the government doesn't like was thus descriptively accurate; it was not intended to alter the statutory standard.

368 F.3d 691, 691-92 (7th Cir. 2004) (internal citations omitted).

"Barrett does not stand for the proposition that, as a matter of law, the jobs identified by the VE must exist within the claimant's locality." Smith v. Astrue, No. 07-C-0955, 2008 WL 794518, at *12 (E.D. Wis. Mar. 24, 2008) (citing Isaacs v. Barnhart, No. 05CV00185, 2006 WL 3240114 (S.D. Ind. Oct. 13, 2006); Knox v. Barnhart, No. 05CV00155, 2006 WL 3201913 (S.D. Ind. Aug. 22, 2006)). In any event, in this case the VE identified jobs not in the national economy but within the State of Wisconsin. Plaintiff cites no authority for the proposition that jobs must be more proximate than that. Cf. SSR 83-12 (stating that in cases involving loss of use of an upper extremity, the VE should "provide a statement of the incidence of those jobs in the region of the individual's residence or in several regions of the country"). Therefore, I reject this argument.

## 3. Consistency with the DOT

Finally, plaintiff argues, for the first time in her reply brief, that despite his statement to the contrary the VE's testimony was not consistent with the DOT. For several reasons, I reject this argument.

14

First, arguments raised for the first time in reply may be deemed waived. See, e.g., United States v. Diaz, 533 F.3d 574, 577 (7th Cir. 2008); Damato v. Sullivan, 945 F.2d 982, 988 n.5 (7th Cir. 1991). Plaintiff attempts to explain her failure to timely raise the issue by claiming that the Commissioner in his response brief relied upon the DOT, without any citations to occupations discussed therein. (Pl.'s Reply Br. at 3.) However, aside from noting the VE's statement that his testimony was consistent with the DOT, the Commissioner did not discuss the DOT in his response brief. Thus, plaintiff may not raise non-compliance with the DOT in reply to something the Commissioner said in response.[9]

Second, even if I were to overlook the waiver, plaintiff must also overcome the fact that her counsel did not at the hearing ask the VE to provide DOT codes or otherwise question him about any inconsistency between the identified jobs and the Dictionary. While this does not result in forfeiture of any such arguments in this court, it does require plaintiff to show that the conflicts were "obvious enough that the ALJ should have picked up on them without any assistance." Overman v. Astrue, 546 F.3d 456, 463 (7th Cir. 2008) (citing SSR 00-4p). Plaintiff argues that the ALJ's duty was triggered when the VE first testified that the jobs were light, then stated on cross examination that they were sedentary. As explained above, the VE's statement that the jobs required little lifting does not necessarily mean they are sedentary. Plaintiff cites no other basis for finding that the ALJ should have noticed a conflict. See Hofer v. Astrue, 588

---

[9]In the exercise of discretion, I allowed the Commissioner to file a sur-reply limited to this issue. See S.E.C. v. Homa, No. 99 C 6895, 2006 WL 3267645, at *8 n.7 (N.D. Ill. Nov. 6, 2006) (noting that the district court may consider matters raised first in reply, so long as the opponent is allowed to respond) (citing Black v. TIC Inv. Corp., 900 F.2d 112, 116 (7th Cir. 1990)); see also United States v. Wilson, 962 F.2d 621, 627 (7th Cir. 1992) (exercising discretion to consider issue first raised in reply, despite the general rule that such issues are waived).

15

F. Supp. 2d 952, 966 (W.D. Wis. 2008) ("Unlike in <u>Overman</u>, where cross examination of the vocational expert should have alerted the adjudicator to possible discrepancies between the expert's testimony and the Dictionary, there were no obvious conflicts in this case that the administrative law judge failed to address."). Therefore, I reject plaintiff's argument that the ALJ violated his duty to "investigate and resolve apparent conflicts between the VE's evidence and the DOT." SSR 00-4p.

Finally, even if I were to overlook both of these impediments to reaching the merits of the argument, plaintiff fails to demonstrate reversible error. She asserts that the "video monitor" job the VE identified corresponds to the DOT position of "surveillance-system monitor," code 379.367-010, which is a sedentary job. <u>See</u> http://www.occupationalinfo.org/37/379367010.html. Assuming, <u>arguendo</u>, that this is the job the VE meant,[10] plaintiff fails to explain why she cannot do it. As stated above, under § 404.1567(b) a person capable of light work is presumed capable of sedentary work, unless additional limiting factors would preclude such work. Plaintiff cites no authority for the proposition that someone with upper extremity restrictions is barred from <u>all</u> jobs classified as sedentary under the DOT; nor does she contend that she cannot, due to her limitations, perform this particular job. <u>See</u> SSR 83-12 (stating that a VE can determine the size of the

---

[10]Because no one asked the VE to provide specific DOT titles, we can at this point only speculate. As Judge Crabb recently explained, while it might be helpful if ALJs required VEs to provide specific citations from the DOT, SSR 00-4p does not require that step. The Ruling allows ALJs to assume that a VE who swears under oath that his testimony is consistent with the DOT is telling the truth, requiring further inquiry only if the VE admits that his testimony is inconsistent or if the conflict is obvious. <u>Hofer</u>, 588 F. Supp. 2d at 967. Judge Crabb further explained that "there is little that is unfair about this procedure [because a] lawyer who wants to cross-check the job titles cited by a vocational expert against the descriptions set forth in the Dictionary is free to ask the expert to provide the relevant Dictionary citations; if the expert refuses to provide this information, the result is likely to be a remand." <u>Id.</u>

16

remaining occupational base when the claimant has lost use of an upper extremity).

Plaintiff asserts that the second job identified by the VE – "gate tender" – is actually an alternate title for "Injection-Molding-Machine-Offbearer," code 690.686-042. But I doubt the VE was proposing that plaintiff remove "musical instruments or parts, such as kazoos, fifes, and recorders, from [the] discharge outlet of [an] injection-molding machine," a medium level job. See http://www.occupationalinfo.org/69/690686042.html. Rather, he said that the gate tender job would involve "checking people in and out of an area." (Tr. at 247.)[11]

Plaintiff contends that the third job – "office helper" – requires "frequent reaching, handling, and fingering," beyond her RFC. (Pl.'s Reply Br. at 3.) The DOT itself does not include this requirement, see http://www.occupationalinfo.org/23/239567010.html., but its companion volume, the Selected Characteristics of Occupations, does. Again, assuming this is the DOT code for the job the VE identified, SSR 00-04p recognizes that the DOT "lists maximum requirements of occupations as generally performed," and a VE "may be able to provide more specific information about jobs or occupations than the DOT." See Powers v. Apfel, 207 F.3d 431, 436 (7th Cir. 2000) ("Even if [the VE's] testimony were considered to contradict the description of sedentary work in the Dictionary of Occupational Titles, which we do not believe it does, a hearing officer is entitled to rely on expert testimony that contradicts such authorities."). In any event, even if plaintiff has exposed a conflict regarding this job, because the VE identified a substantial number of other jobs, any error is harmless. See Ketelboeter, 550 F.3d at 626 (finding VE conflict with the DOT regarding one job harmless where the VE also identified other jobs the claimant could do).

--------

[11]Perhaps the VE referred to the DOT position of "gatekeeper," code 372.667-030, a light job. See http://www.occupationalinfo.org/37/372667030.html.

17

**B.** **Arguments for Remand for Further Proceedings**

**1.** **Complex Regional Pain Syndrome**

Plaintiff argues that the ALJ failed to explain why her complex regional pain syndrome ("CRPS") did not constitute a severe impairment, equal a Listing or reduce her RFC. She also faults the ALJ for not obtaining expert medical testimony or clarification from the treating source on this condition.

As explained in SSR 03-02p:

> CRPS is a chronic pain syndrome most often resulting from trauma to a single extremity. It can also result from diseases, surgery, or injury affecting other parts of the body. Even a minor injury can trigger []CRPS. The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone. It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual.

For purposes of Social Security disability evaluation, CRPS may be established by the presence of persistent complaints of pain that are typically out of proportion to the severity of any documented precipitant, and one or more of the following clinically documented signs in the affected region: swelling; autonomic instability, seen as changes in skin color or texture, changes in sweating (decreased or excessive sweating), changes in skin temperature, and abnormal pilomotor erection (gooseflesh); abnormal hair or nail growth (growth can be either too slow or too fast); osteoporosis; or involuntary movements of the affected region of the initial injury. SSR 03-02p.

The only reference to CRPS in the record of this case comes from a July 15, 2005, note from Dr. Knavel, in which he stated: "One has to seriously think that this lady may have

18

complex regional pain syndrome. Her wrist and hand are not shiny or atrophic but the persistence of the pain, and the pain to the widespread area is certainly consistent with that." (Tr. at 185.) The ALJ noted Dr. Knavel's observation in his decision (Tr. at 15) but did not further mention this condition. Nevertheless, I cannot conclude that he erred in this regard.

The record contains no clear diagnosis of CRPS.[12] Dr. Knavel did not make one, and under the criteria set forth in SSR 03-02p it does not appear that such a diagnosis would be warranted. Plaintiff reported persistent, widespread pain to be sure, but Dr. Knavel noticed no changes in skin color or texture, or any other sign of the condition; plaintiff points to no other evidence of the necessary signs of the condition. No other medical professional even mentioned CRPS, much less imposed any restriction on plaintiff's ability to work based thereon. Thus, I cannot conclude that the ALJ erred in declining to find this a severe, medically determinable impairment at step two.[13] Nor can I conclude that he erred at steps three and four. Plaintiff points to no evidence of record suggesting that her CRPS meets or equals a Listing, or that it results in limitations greater than those included in the ALJ's RFC.

Finally, I cannot conclude that the ALJ erred in failing to obtain further medical testimony

---

[12]Contrary to plaintiff's contention, the ALJ did not concede a "diagnosis" of CRPS. Rather, he simply paraphrased Dr. Knavel's note. (Tr. at 15 – "[Dr. Knavel] opined that she appeared to have symptoms consistent with a diagnosis of complex regional pain syndrome.")

[13]In her reply brief, plaintiff objects to the Commissioner's post-hoc arguments as to the severity of the CRPS. "[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ." Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003). But it is also well-settled that "[n]o principle of administrative law or common sense requires [the court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). The ALJ considered plaintiff's limited ability to use her right arm and her allegations of disabling pain. Plaintiff provides no reason to believe that the ALJ would have reached a different conclusion had he labeled plaintiff's condition "complex regional pain syndrome."

19

or clarification on the issue. The district court generally must respect an ALJ's decision on the collection of evidence, see Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir.1993), and plaintiff provides no reason to question his judgment here.[14] This is not a case where the ALJ ignored or failed to receive medical evidence on a condition affecting the claimant's ability to work. Whatever label one puts on it – CRPS, median neuropathy, tenosynovitis – the ALJ considered plaintiff's pain and limited use of the right arm.

### 2. Mental Impairment

Plaintiff next contends that the ALJ failed to properly evaluate her mental impairment. She notes that she alleged depression, anxiety and panic attacks in some of her submissions to the SSA; that the hearing in her case was short; and that the ALJ never asked her about mental impairments, thus violating his duty to develop the record.

Plaintiff was represented by counsel in this case, and although that fact does not eliminate the ALJ's duty to develop the record, Patterson v. Barnhart, 428 F. Supp. 2d 869, 887 (E.D. Wis. 2006), it does place plaintiff's argument on different footing, see Smith, 2008 WL 794518, at *8 (stating that while the ALJ always has a duty to fully and fairly develop the record, "the claimant bears the burden of presenting adequate medical evidence to support his claim"). Counsel asked plaintiff no questions about any mental impairment at the hearing, and although in a pre-hearing submission counsel mentioned panic attacks, anxiety and depression in a list of impairments, he cited no medical evidence and proposed no restrictions related to those mental impairments. (Tr. at 228.) Even now, plaintiff suggests no specific restrictions on her

---

[14]I note that plaintiff was represented by counsel before the ALJ, and counsel did not request further medical evaluation. See Sears v. Bowen, 840 F.2d 394, 402 (7th Cir. 1988) (stating that when a claimant is represented by counsel the ALJ is entitled to presume that she had made her best case).

ability to work based on mental impairments. Thus, any possible error in the ALJ's evaluation was harmless. See Fountain v. R.R. Ret. Bd., 88 F.3d 528, 532-33 (8th Cir. 1996) (holding that the ALJ's failure to complete a PRTF was harmless where the evidence of a mental impairment was insubstantial).[15]

Plaintiff argues that because the record contains no consultant's report finding her mental impairment non-severe, the ALJ relied on his lay view of the record in making this determination. "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings," Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996), but the ALJ did no such thing here. The record contains no medical evidence showing that plaintiff did have a severe mental impairment. Thus, the ALJ did not substitute his judgment for a medical professional.[16] Nor was there anything improper in the ALJ's discussion of the evidence, sparse though it was, which made mention of mental health issues and use of Zoloft. ALJs are supposed to review all of the evidence in making their decisions.[17]

### 3. Credibility

Finally, plaintiff argues that the ALJ erred in evaluating the credibility of her testimony. Under SSR 96-7p, the ALJ must follow a two-step process in evaluating the claimant's testimony and statements about symptoms such as pain, fatigue or weakness. First, the ALJ

---

[15]Plaintiff states that at one point her doctor prescribed Zoloft, but as the ALJ noted, this prescription related to her complaints of insomnia, not depression or some other mental illness. (Tr. at 15.)

[16]As plaintiff notes, lack of treatment does not necessarily equal lack of a severe mental disorder. But the ALJ could in this case reasonably conclude, based on the lack of any substantial evidence, that plaintiff had no severe mental impairment.

[17]Plaintiff again suggests that the ALJ could have obtained a mental health evaluation. SSR 03-02p permits but does not require the ALJ to obtain such an evaluation.

21

must consider whether the claimant suffers from an impairment that could reasonably be expected to produce the symptoms. If not, the symptoms cannot be found to affect the claimant's ability to work. Second, if the ALJ finds that the claimant has an impairment that could produce the symptoms alleged, the ALJ must determine the extent to which they limit the claimant's ability to work. If the claimant's statements are not fully substantiated by objective medical evidence, the ALJ must make a credibility finding based on an evaluation of the entire case record, considering in addition to the medical evidence the claimant's activities; the duration, frequency and intensity of the symptoms; precipitating and aggravating factors; treatment modalities; and functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. So long as the ALJ substantially complies with these requirements, the court will reverse the resulting credibility determination only if it is patently wrong. See Jens, 347 F.3d at 213; see also Berger, 516 F.3d at 546.

Plaintiff alleges that the ALJ failed to comply with SSR 96-7p, but I disagree. After reviewing plaintiff's hearing testimony about the frequency and intensity of her pain, the ALJ found that plaintiff's impairments could produce the symptoms alleged, but that plaintiff's statements as to the severity of those symptoms were not credible to the extent that they were inconsistent with the RFC the ALJ adopted.[18] (Tr. at 17.) In support of this finding, the ALJ considered the medical evidence, including the fact that Dr. Fideler released plaintiff back to work in 1997, essentially without restriction, and in his April 20, 2006 report found her capable

---

[18]Contrary to plaintiff's suggestion, the ALJ did not use the RFC finding as a proxy for a credibility determination. The ALJ analyzed plaintiff's testimony and made a specific finding on credibility. Nor did the ALJ discount plaintiff's testimony based solely on the lack of medical support. The ALJ is permitted to consider the medical evidence, along with the other SSR 96-7p factors, in evaluating credibility.

of light work (consistent with the assessment of the SSA consultants) with restrictions on the use of her right arm.  (Tr. at 17.)[19]

The ALJ did not stop with the medical evidence.  He also found plaintiff's hearing testimony inconsistent with a function report she filed at the time of her application in which she described fairly full daily activities, including caring for her grandchildren, doing laundry, tending to her garden, vacuuming and dusting, washing and cleaning, mowing the lawn, shoveling snow, caring for a pet, and looking for a job she could do.  (Tr. at 16; 86; 88.)  She also described helping an elderly friend with bathing and household chores.[20]  (Tr. at 16; 87.)  Finally, the ALJ noted that plaintiff took over-the-counter Tylenol when she over-did it and sought the assistance of her ex-husband.  (Tr. at 17.)

Plaintiff faults the ALJ for not discussing certain other reports, but the ALJ is not required to discuss in writing every piece of evidence in the record.  Diaz v. Chater, 55 F.3d 300, 309 (7th Cir. 1995).  The ALJ was permitted to conclude that plaintiff's hearing testimony, in which she asserted worse symptoms, was exaggerated.  See Brewer v. Chater, 103 F.3d 1384, 1392 (7th Cir. 1997) ("The ALJ's crediting of Ms. Brewer's contemporaneous statements concerning her job duties and his discounting of her later statements at the hearing were proper."),

---

[19]The ALJ found Dr. Fideler's assessment more persuasive than Ms. Cuculi's and afforded it controlling weight.  First, as an occupational therapist, Cuculi was not an "acceptable medical source."  See 20 C.F.R. § 404.1513(a).  Second, Dr. Fideler based his evaluation on the longitudinal picture gleaned from a treatment relationship lasting many years, while Cuculi met with plaintiff just once, to perform a functional capacity evaluation.  Third, the record contained no evidence that plaintiff put forth a good effort during the evaluation.  Fourth, Cuculi's findings were inconsistent with the daily activities plaintiff reported in her disability reports to the SSA.  (Tr. at 18.)

[20]Plaintiff wrote that she needed no help with these tasks  (Tr. at 88), and she noted no problems paying attention, following instructions, handling stress or getting along with others (Tr. at 91-92).

23

overruled on other grounds by <u>Johnson v. Apfel</u>, 189 F.3d 561 (7th Cir. 1999).  In sum, the ALJ considered the relevant factors and reached a conclusion that cannot be deemed patently wrong.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 23rd day of April, 2009.


/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

24